FILED
2017 Mar-16  AM 08:05
U.S. DISTRICT COURT
N.D. OF ALABAMA


# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **AUTO-OWNERS INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 5:15-cv-1118-CLS** |
| | ) | |
| **WIER-WRIGHT ENTERPRISES, INC. d/b/a DOUG WIERSIG HOMES,** *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Auto-Owners Insurance Company seeks a declaration that there is no coverage under commercial liability insurance policies it issued to Weir-Wright Enterprises, Inc., doing business as "Doug Wiersig Homes," and Jason Roop, doing business as "Jason Roop Home Improvement," for claims asserted against those businesses by Justin Kane Bell and Amy Bell in an underlying action pending in the Circuit Court of Madison County, Alabama.[1] The controversy now is before the court on plaintiff's

---

[1] *See* doc. no. 19 (First Amended Complaint for Declaratory Judgment). Federal jurisdiction is based upon 28 U.S.C. §§ 1332 and 2201. The requirements of § 1332, the diversity statute, are satisfied because plaintiff is a Michigan corporation with its principal place of business in the State of Michigan, all defendants are Alabama residents, and the amount in controversy exceeds $75,000.00. *See* 28 U.S.C. § 1332(a)(1). Section 2201 provides that:

"In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not

two motions motion for summary judgment:  doc. no. 44, seeking summary judgment against defendant Jason Roop; and doc. no. 46, seeking the same relief against defendant Wier-Wright Enterprises, Inc.  Upon consideration of both motions, as well as the parties' briefs and evidentiary submissions, the court concludes the motions are due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." (Alteration and ellipsis supplied).

moving party are not unqualified, however. "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. PROCEDURAL HISTORY OF THIS CASE

The operative pleading in this case is Auto-Owners' First Amended Complaint for Declaratory Judgment.[2] Auto-Owners filed that pleading on November 16, 2015, naming as defendants Justin Kane Bell, Amy Bell, Wier-Wright Enterprises, Inc., doing business as "Doug Wiersig Homes" ("Wier-Wright"), and Jason Roop, doing

---

[2] Doc. no. 19 (First Amended Complaint for Declaratory Judgment).

business as "Jason Roop Home Improvement" ("Roop").[3]  Neither Wier-Wright nor

Roop answered the First Amended Complaint or otherwise appeared in the case.

Accordingly, this court entered partial default judgments against Wier-Wright on

December 22, 2015,[4] and against Roop on July 28, 2016.[5]  In doing so, this court

wrote that, because those defendants had failed to participate in the litigation, they

would "not be allowed to appear at any later stage of [the] litigation and assert

substantive positions."[6]  Even so, out of fairness to the remaining defendants, Justin

Kane Bell and Amy Bell, who are the plaintiffs in the underlying state court case, this

court found that "judgment on the merits will not be entered until the issue of

insurance coverage has been fully litigated in the present, declaratory judgment

proceeding between plaintiff, Auto-Owners Insurance Company, and the remaining

defendants, Justin Kane Bell and Amy Bell."[7]

Auto-Owners filed its motion for summary judgment with regard to Jason

Roop, doing business as "Jason Roop Home Improvement," on August 24, 2016.[8]  It

filed its motion for summary judgment with regard to Weir-Wright Enterprises, Inc.,

---

[3] *Id.* at ¶¶ 1-6.

[4] Doc. no. 31.

[5] Doc. no. 43.

[6] Doc. no. 31, at 3-4; doc. no. 43, at 3-4 (alteration supplied).

[7] Doc. no. 31, at 4; doc. no. 43, at 4.

[8] Doc. no. 44.

doing business as "Doug Wiersig Homes," on August 31, 2016.[9]  Both of those

motions were filed prior to the completion of discovery.  The Scheduling Order

entered in this case on July 11, 2016, required all discovery to be commenced in time

to be completed by December 2, 2016, and it required all dispositive motions to be

filed by January 6, 2017.[10]  The parties later filed a joint motion to extend the

dispositive motion deadline, asserting that the underlying state court action was not

set for trial until March 27, 2017, and it would be preferable to have access to the

record developed in preparation for that state-court trial prior to filing any further

dispositive motions in this case.[11]  This court granted the parties' joint motion, and

extended the dispositive motion deadline to May 1, 2017.[12]

## III. ALLEGATIONS OF THE COMPLAINT IN THE UNDERLYING STATE COURT ACTION

The underlying state court suit is styled *Justin Kane Bell and Amy Bell vs.*

*Wier-Wright Enterprises, Inc. d/b/a Doug Wiersig Homes; Bulldog Construction,*

*LLC; Timothy Widner d/b/a Timothy Widner Construction; Alabama Fireplace and*

*Construction Specialists, LLC; Jason Roop d/b/a Roop Roofing,* and it is pending as

Civil Action No. CV 2013-902000 JPS in the Circuit Court of Madison County,

---

[9] Doc. no. 46.

[10] Doc. no. 40 (Scheduling Order), at ¶¶ 2-3.

[11] *See* doc. no. 62 (Motion for Extension of Time), at ¶¶ 2-4.

[12] Doc no. 63 (Text Order Granting Motion for Extension of Time).

Alabama.[13]  That suit was commenced on September 9, 2013.[14]

Auto-Owners was granted permission to intervene in the state court action on August 20, 2014, as the liability insurer for Wier-Wright.  Since its intervention, Auto-Owners has received electronic notice of all of the filings in the state-court action.[15]

The Bells filed a Second Amended Complaint on January 29, 2015, adding "Jason Roop, d/b/a Roop Roofing," as a defendant.[16]  Other defendants also were added by the Second Amended Complaint, but the claims against those defendants are not relevant to the outcome of this declaratory judgment action.

The Bells alleged in their state-court Second Amended Complaint that Justin Kane Bell entered into an agreement with Wier-Wright for the construction of a new home in Gurley, Alabama, and that his wife, Amy Bell, was a third party beneficiary of that agreement.[17]  The cost of construction was $393,980.00, including a down payment of $15,000.00.[18]  The Bells also alleged that:

> 14.   As agreed, Mr. Bell paid Wier-Wright in full for all amounts for which he was invoiced under the Agreement.  Wier-Wright

---

[13] Doc. no. 46-4 (Second Amended Complaint in State Court Case), at ECF 2.

[14] Doc. no. 46-14 (Original Complaint in State Court Case), at ECF 2.

[15] Doc. no. 52-1 (Declaration of Patrick Miller), at ¶ 4.

[16] Doc. no. 46-4 (Second Amended Complaint in State Court Case), at ECF 2.

[17] *Id.* at ¶ 12.

[18] *Id.* at ¶ 13.

knowingly, intentionally, and fraudulently represented that a portion of these payments would be used to pay the subcontractors and suppliers for the construction of the house. The Plaintiffs relied upon these fraudulent representations. However, contrary to the misrepresentations of Wier-Wright and in breach of the terms of the Agreement, Wier-Wright fraudulently, knowingly, and deliberately failed to pay the suppliers and subcontractors, pocketed and/or misappropriated the money paid by the Plaintiffs intended for the supplies and subcontractors, and eventually stopped construction of the Plaintiffs' home.

15.     Wier-Wright fraudulently suppressed from the Plaintiffs the fact that Wier-Wright was not paying the suppliers and subcontractors as required under the terms of the Agreement.

16.     As a direct result of Wier-Wright's breach of contract and fraud, many of the suppliers and subcontractors for the construction of the home, including Alabama Concrete, Cell-Pak Services, Dean & Sons Plumbing, Henley Supply, Inc., and L & W Supply Corporation, doing business as Alabama Drywall, filed materialmens liens against the Plaintiffs' home.

17.     After Wier-Wright abandoned the construction of the Plaintiffs' home, the Plaintiffs had to borrow an additional One Hundred Thousand Dollars ($100,000.00) in order to complete the construction of the home. This money had to be borrowed and financed under less favorable terms and conditions than the Plaintiffs' previous loan due to the liens filed against their home due to Wier-Wright's fraud and breach of contract. The Plaintiffs also had to borrow additional funds because the Plaintiffs were given incorrect and grossly low estimates by Wier-Wright for the home's electrical work, HVAC, plumbing, and other material components of the home.

18.     Though the liens have since been released, the suppliers and subcontractors who worked on the home were not paid by Wier-Wright as required by the Agreement.

19.     On or about February of 2013, the home's roof began to leak.  The leaking roof was proximately caused by the negligence, wantonness, and incompetence of Wier-Wright, and, upon information and belief, Bulldog Construction, Timothy Widner d/b/a Timothy Widner Construction, Alabama Fireplace and Construction Specialists, LLC, Roop, and Fictitious Party Defendants "J," "K," and "L."  The leaking roof caused damage to the remainder of the house, furnishings, appliances, and other property belonging to the Plaintiffs.  The resulting damage to the house has substantially reduced its value, as well as the Plaintiffs' enjoyment of and ability to utilize the house as their residence.  The costs of repairing the roof, the resulting damage to the house and the Plaintiffs' property, and the diminished value of the house are in excess of $100,000.00.

20.     Wier-Wright, and, upon information and belief, Bulldog Construction, Timothy Widner d/b/a Timothy Widner Construction, Alabama Fireplace and Construction Specialists, LLC, Roop, and Fictitious Party Defendants "J," "K," and "L" failed to construct the Plaintiffs' home in a workmanlike manner and otherwise in compliance with established building standards.  Wier-Wright, and, upon information and belief, Bulldog Construction, Timothy Widner d/b/a Timothy Widner Construction, Alabama Fireplace and Construction Specialists, LLC, Roop, and Fictitious Party Defendants "J," "K," and "L" failed to perform its work [*sic*] in accordance with the parties' Agreement regarding the construction of the Plaintiffs' home.  Wier-Wright, and, upon information and belief, Bulldog Construction, Timothy Widner, Alabama Fireplace and Construction Specialists, LLC, Roop, and Fictitious Party Defendants "J," "K," and "L" negligently and/or wantonly constructed the Plaintiffs' home, and failed to ensure that the home was constructed in a workmanlike manner, and/or in compliance with applicable standards.

21.     As a proximate result of the Defendants' conduct, the Plaintiffs have incurred substantial compensatory damages, and suffered mental anguish.  The Plaintiffs will also incur further losses and damages in the future.

Doc. no. 46-4 (Second Amended Complaint in State Court Case), at ¶¶14-21.  Based

upon those allegations, the Bells asserted claims against Wier-Wright for breach of

contract (Count One), fraud (Count Two), gross negligence/misconduct (Count

Three), and breach of the implied warranty of habitability (Count Six).  The Bells

asserted claims against both Wier-Wright and Roop (and against other defendants

who are not relevant to this federal declaratory judgment action) for negligence

(Count Four) and wantonness (Count Five).[19]  They demanded compensatory and

punitive damages, as well as attorneys' fees and costs.[20]

Wier-Wright filed a First Amended Cross-Claim Complaint in the state court

action on February 5, 2015, asserting claims for common law indemnification, breach

of implied and express warranties, and breach of duty against "Jason Roop d/b/a

Roop Roofing," as well as against other cross-claim defendants who are not relevant

to the outcome of this federal declaratory judgment action.[21]

Jason Roop was served with copies of the Bells' Second Amended Complaint

and Wier-Wright's First Amended Cross-Claim Complaint on March 17, 2015.[22]  The

attorney assigned by Auto-Owners to represent Roop under a reservation of rights

---

[19] *Id.* at ¶¶ 22-33.

[20] *Id.*

[21] Doc. no. 44-12 (First Amended Cross-Claim Complaint in State Court Case).

[22] *See* doc. no. 44-13 (Proof of Service of Bells' Second Amended Complaint Against Jason Roop); doc. no. 44-14 (Proof of Service of Wier-Wright's Cross-Claim Against Jason Roop).

filed an answer to Wier-Wright's First Amended Cross-Claim on June 18, 2015,[23] and he filed an answer to the Bells' Second Amended Complaint on June 19, 2015.[24]

## IV. ADDITIONAL FACTS RELEVANT TO THE PRESENT CONTROVERSY

### A.    Wier-Wright's Auto-Owners Policy

Auto-Owners issued Policy Number 054617-38583084-11 (the "Wier-Wright policy") to Wier-Wright Enterprises, Inc., on February 2, 2011.  The policy term was from 12:01 a.m. on February 19, 2011 to 12:01 a.m. on February 19, 2012.[25]  Under the terms of that policy, Auto-Owners agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages."[26]  The Wier-Wright policy stated that it applied to "bodily injury" and "property damage" only if

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)    The "bodily injury" or "property damage" occurs during the policy period; and

(3)    Prior to the policy period, no insured listed under Paragraph 1 of

---

[23] Doc. no. 44-20 (Response to First Amended Cross-Claim Complaint).

[24] Doc. no. 44-21 (Response to Second Amended Complaint).

[25] Doc. no. 46-3 (Wier-Wright Policy), at ECF 2.

[26] *Id.* at ECF 8, Section I(A)(1)(a).

Section II — Who is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

Doc. no. 46-3 (Wier-Wright Policy), at ECF 8, Section I(A)(1)(b). The policy also provided that:

"Bodily injury" or "property damage" will be deemed  to have been known to have occurred at the earliest time when any insured listed under Paragraph 1 of Section II – Who is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1)    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2)    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3)    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

*Id.*, Section I(A)(1)(c).

The Wier-Wright policy also contained certain exclusions that are relevant to the current controversy. For example, the policy stated that it did not apply to:

### a.    Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from

the standpoint of the insured. . . .

      **b.**    **Contractual Liability**

     "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. . . .

*Id.,* Section I(A)(2)(a)-(b) (boldface type in original, ellipses supplied).  The policy

also provided that it did not apply to "property damage" to "[t]hat particular part of

any property that must be restored, repaired or replaced because 'your work' was

incorrectly performed on it."   *Id.,* at ECF 12, Section I(A)(2)(j)(7) (alteration

supplied).

     The policy outlined the following duties of an insured in the event of an

occurrence, offense, claim or suit:

    a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

        (1)    How, when and where the "occurrence" or offense took place;

        (2)    The names and addresses of any injured persons and witnesses; and

        (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b.    If any claim is made or "suit" is brought against any insured, you must:

(1)    Immediately record the specifics of any claim or "suit" and the date received; and

(2)    Notify us as soon as practicable.

You must see to it that we receive written notice of any claim or "suit" as soon as practicable.

c.    You and any other involved insured must:

(1)    Immediately send us copies of any correspondence, demands, notices, summonses or papers in connection with any claim or "suit";

(2)    Authorize us to obtain records and other information;

(3)    Cooperate with us in the investigation or settlement of any claim or defense of any "suit"; and

(4)    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

*Id.* at ECF 21, Section IV(2).

The Wier-Wright policy defines the term "bodily injury" as meaning "bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time." *Id.* at ECF 24, Section V(4). An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Doc. no. 46-3 (Wier-Wright policy), at ECF 26, Section V(14). "Property damage" is defined as:

      a.      Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      b.      Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.* at ECF 27, Section V(18).  The term "suit" means "a civil proceeding in which damages because of 'bodily injury' [or] 'property damage' . . . to which this insurance applies are alleged."[27]  "Your product" is defined as

      (1)      Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            (a)      You;

            (b)      Others trading under your name; or

            (c)      A person or organization whose business or assets you have acquired; and

      (2)      Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or services.

*Id.* at ECF 28, Section V(26)(a).  The term "your product" also includes:

      (1)      Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2)      The providing of or failure to provide warnings or instructions.

---

[27] Doc. no. 46-3 (Wier-Wright Policy), at ECF 27, Section V(21).

*Id.*, Section V(26)(b).  The term "your work"

    a.    Means:

        (1)    Work or operations performed by you or on your behalf; and

        (2)    Materials, parts or equipment furnished in connection with such work or operations.

    b.    Includes:

        (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

        (2)    The providing of or failure to provide warnings or instructions.

*Id.,* Section V(27).

## B.    Jason Roop's Auto-Owners Policy

Auto-Owners issued Policy Number 142317-38696744-14 (the "Jason Roop policy") to "Jason Roop DBA Jason Roop Home Improvement" on January 7, 2014. The original policy term was from 12:01 a.m. on January 3, 2014, to 12:01 a.m. on January 3, 2015,[28] but the policy was cancelled effective March 9, 2014, for non-payment of premiums.[29]  The Jason Roop policy contained all of the same operative language as the Auto-Owners policy outlined above.

---

[28] Doc. no. 44-2 (Jason Roop Policy), at ECF 2.

[29] *Id.* at ECF 6.

C.     **Wier-Wright's Contract with Justin Kane Bell**

Wier-Wright entered into an "Agreement for the Construction of a Single Family Residence Fixed Contract" with Justin Kane Bell on June 21, 2011.  (Amy Bell did not sign the contract, but the parties do not appear to dispute that she was an intended third-party beneficiary of the agreement between her husband and Wier-Wright.)  Wier-Wright agreed to build a home for Bell "in a good, workmanlike, and substantial manner" for the price of $393,980.00, including a $15,000.00 down payment.[30]  The home was to be "substantially completed" within 180 days of the contract date, with exceptions permitted for

> acts of God, acts of the Owner or Owner's agent, inclement weather, wet or muddy grounds, acts of public utilities, public bodies, or inspectors, extra work, failure of the Owner to make progress payments promptly, or other contingencies unforseeable by the Contractor and beyond the reasonable control of the Contractor.

Doc. no. 46-4 (Doug Wiersig Homes Agreement for the Construction of a Single Family Residence Fixed Contract), at ECF 15, ¶ 9.  The contract contained the following language pertaining to warranties:

> The Contractor and the Owner agree to the terms and conditions of the Limited Warranty Agreement attached hereto as Exhibit C and made a part of this Agreement.   The terms and provisions of the Limited Warranty Agreement have been fully negotiated between the Owner and the Contractor as a part of the negotiation of the terms and provisions of

---

[30] Doc. no. 46-4, at ECF 14 (Doug Wiersig Homes Agreement for the Construction of a Single Family Residence Fixed Contract).

this Agreement.  The Limited Warranty Agreement has been fully executed, as of the date of this Agreement, and the terms and provisions thereof are an integral part of the terms and provisions of this Agreement.  The Owner and the Contractor agree to re-execute the Limited Warranty Agreement and to deliver duplicate originals of same at the Closing.  The Owner and the Contractor agree to be fully bound by the terms and provisions of the Limited Warranty Agreement and agree that the Limited Warranty Agreement shall survive the Closing and the conveyance of title to the Property.  Pursuant to the Limited Warranty Agreement, the Owner and the Contractor shall make a preoccupancy inspection of the Dwelling and shall complete the Preoccupancy Inspection Agreement, which is attached as an exhibit to the Limited Warranty Agreement.

WAIVER OF WARRANTIES AND CLAIMS.  THE OWNER AGREES THAT THE LIMITED WARRANTY AGREEMENT IS GIVEN IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY AND WORKMANSHIP, AND IS ALSO IN LIEU OF ANY CLAIMS FOR CONSEQUENTIAL DAMAGES, MENTAL ANGUISH OR DISTRESS, AND THE OWNER HEREBY EXPRESSLY WAIVES AND DISCLAIMS ANY SUCH WARRANTIES AND CLAIMS WITH RESPECT TO BOTH THE DWELLING AND THE PROPERTY.

*Id.* at ECF 16-17, ¶ 15 (capitalization in original).

## D.    The Construction of the Bells' Home

Wier-Wright commenced work on the Bells' home sometime in 2011.  Doug Wiersig testified that he *thought* construction of the Bells' roof was subcontracted to Jason Roop, but he could not recall for sure where it was Roop or another roofing

subcontractor.[31]  The roof began leaking sometime during December of 2011, before

the home was completed.[32]  Wier-Wright made repairs to the roof at that time, and

also repaired some sheetrock that had suffered water damage as a result of the leak.[33]

Amy Bell received a text message from Doug Wiersig on January 19, 2012,

stating:  "I do not have the funds to finish your house.  I am closing my business.

Sorry."[34]  At that point, the construction of the home was somewhere between 60 and

80 percent complete.[35]  The Bells hired other contractors to finish the construction of

the home,[36] and they financed an additional $100,000 in order to pay those

contractors.[37]

The home was completed, and the Bells moved into it, sometime during August

of 2012.[38]

### E.    2013 Water Damage and Related Insurance Claim

During February of 2013, the Bells observed water leaks in the same locations

---

[31] Doc. no. 46-5 (Deposition of Doug Wiersig), at 48, 130.

[32] Doc. no. 55-1 (Affidavit of Justin Kane Bell), at ¶ 7.

[33] Doc. no. 46-7 (Deposition of Justin Kane Bell), at 190-92; doc. no. 46-5 (Deposition of Doug Wiersig), at 56, 167-68.

[34] Doc. no. 46-6 (Deposition of Amy Bell), at 27-28.

[35] *Id.* at 33; doc. no. 46-5 (Deposition of Doug Wiersig), at 69; doc. no. 46-7 (Deposition of Justin Kane Bell), at 65.

[36] Doc. no. 46-6 (Deposition of Amy Bell), at 32.

[37] Doc. no. 46-7 (Deposition of Justin Kane Bell), at 83-84.

[38] Doc. no. 46-6 (Deposition of Amy Bell), at 122; doc. no. 46-7 (Deposition of Justin Kane Bell), at 204.

where leaks had occurred in 2011, prior to completion of construction.[39]  The Bells hired C & K Roofing, an independent third-party contractor, to inspect their roof.  C & K's February 11, 2013 inspection report stated that the roofing shingles had been improperly installed.[40]  The roof continued to leak every time it rained until September of 2014.[41]  The leaks caused damage to the interior structure of the home, as well as to the Bells' furnishings and appliances.[42]

The Bells filed a claim with Wier-Wright's insurance agent,[43] who submitted a "Notice of Occurrence/Claim" form to Auto-Owners on February 5, 2013.  That form described the nature of the potential loss as:  "Property owner had inspector come out and it was noted that fireplaces all have water that is standing around them.  hw [*i.e.,* hardwood] floors starting to buckle."[44]  The Bells also submitted an undated "Proof of Loss" form, stating that "[a] defective construction loss occurred about the hour of 3 o'clock p.m. on the 2nd day of Feb[ruary], 2013."[45]  They described the loss as follows:  "We noticed water damage on walls, floors, ceilings, & fireplaces caused

<hr>

[39] Doc. no. 46-7 (Deposition of Justin Kane Bell), at 101-02, 190-9; doc. no. 55-1 (Affidavit of Justin Kane Bell), at ¶ 10.

[40] Doc. no. 46-9 (C & K Roofing Inspection Report), at ECF 2.

[41] Doc. no. 55-1 (Affidavit of Justin Kane Bell), at ¶ 10.

[42] *Id.* at ¶ 9.

[43] Doc. no. 46-6 (Deposition of Amy Bell), at 230.

[44] Doc. no. 46-10 (General Liability Notice of Occurrence/Claim), at ECF 2 (alteration supplied).

[45] Doc. no 46-11 (Proof of Loss), at ECF 2 (alteration supplied).

by roof leaks."[46]  At the bottom of the form, Justin Kane Bell added a handwritten note, stating:

> I have filled this form out solely for the roof damages.  I cannot obtain cost estimates to fix other damages (*i.e.*) flooring, fireplace, walls, ceilings, insulation, etc., until everything has had sufficient time to dry.  This POL [Proof of Loss] is not intended to represent the entire claim . . . only the roof portion.

Doc. no. 46-11 (Proof of Loss), at ECF 2 (alteration supplied, ellipsis in original).

The Bells engaged a company called Emergency Services 24 to inspect their home on June 3, 2013.  The inspection detected moisture in the wall cavities and floors near the fireplaces.[47]

Evers & Associates inspected the Bells' home on behalf of Auto-Owners on July 26, 2013.  The report of that inspection described the nature of the incident as follows:

> The construction on the claimant['s] dwelling apparently began on August 1, 2011 and the claimant moved in in August 2012.  The claimant['s] dwelling was constructed by the insured, Wier-Wright Enterprises.

> The claimant advised that he began to notice water issues around two of the three chimney's [*sic*] and contacted his homeowners insurance company. The claimant's homeowners company told the claimant to contact his contractor's insurance company as the interior water damage was the result of poor workmanship.

---

[46] *Id.*

[47] Doc. no. 46-7 (Deposition of Justin Kane Bell), at 113-14.  *See also* doc. no. 46-12 (Inspection Report from Emergency Services 24).

-20-

The claimant has sustained continuing water damage to the interior of the dwelling for approximately 8 months.

Doc. no. 46-13 (Evers & Associates Report), at ECF 3 (alterations supplied).

## F.   Communications Between Auto-Owners and its Insureds

### 1.   Wier-Wright

Auto-Owners sent Wier-Wright a letter on November 26, 2013, stating that there was "a question of coverage for the claims" asserted against Wier-Wright by the Bells in the underlying state court action.[48]  Auto-Owners also stated:  "While we continue to investigate this loss and coverage's [*sic*], we reserve the right to withdraw defense should our continued investigation reveal that there is no coverage for this claim."[49]  Auto-Owners sent Wier-Wright a second letter on December 31, 2013, reaffirming its reservation of rights and stating that the Huntsville law firm of Wilmer & Lee had been assigned the defense of Wier-Wright in the underlying state-court action.[50]

### 2.   Jason Roop

Auto-Owners first became aware that Jason Roop was named as a defendant in the underlying state court action on June 1, 2015, when Jason Roop's insurance

---

[48] Doc. no. 46-15 (November 26, 2013 Letter), at ECF 2.

[49] *Id.* at ECF 5.

[50] Doc. no. 46-16 (December 31, 2013 Letter).

agency, Grimwood Insurance, forwarded a notice of loss form and a letter from an

attorney representing Wier-Wright.[51]  That letter, which was dated May 28, 2015,

stated:

> I have recently obtained a certificate of service for Jason Roop
> d/b/a Jason Roop Home Improvement indicating that you are Mr.
> Roop's insurance agent.  The certificate reflects a general commercial
> liability policy with Auto-Owners Insurance with effective dates of
> January 3, 2014 – January 3, 2015.
>
> I am enclosing a copy of a lawsuit that was recently amended to
> add Mr. Roop as a Defendant, as well as an Amended Cross-Claim
> Complaint naming Mr. Roop as a Cross-Claim Defendant. I represented
> Wier-Wright, the general contractor who is asserting the Cross-Claim.
> I have copied Patrick Miller, Esq., who represents the homeowners.
>
> Investigation and discovery indicates [*sic*] Mr. Roop did the
> roofing work on the Plaintiffs' residence that is the subject of the
> enclosed lawsuit.  Mr. Roop was served several months ago but has yet
> to make an appearance.  At this point, no default has been taken.  Please
> notify all insurance carriers that have insured Mr. Roop and his various
> entities since 2011.

Doc. no. 44-16 (May 28, 2015 Letter).

Auto-Owners retained an attorney to represent Roop in the underlying state

court action on June 16, 2015, even though Roop had not contacted Auto-Owners,

and had not personally provided notice of the claims against him.[52]  On that same

date, Auto-Owners sent Roop a letter stating:

---

[51] Doc. no. 44-17 (Affidavit of Todd Simpson), at ¶ 5.

[52] *Id.* at ¶ 6.

Auto-Owners Insurance Company is in receipt of a lawsuit in which you have been named as a defendant. Our records reflect that you had a policy of insurance with us effective 1/3/2014 through 5/4/2014[53] reflected by the above policy number. Under the above referenced policy of insurance, you may be entitled to a defense for the suit that has been brought against you.

At your earliest convenience, please contact me direct . . . so that I may discuss this matter with you. Please note your policy does provide language that requires you to cooperate with us in investigating and defending you. Should you fail to contact the undersigned, and or cooperate with our investigation, you may jeopardize any coverage that may be available to you for this matter.

I look forward to your prompt response to this letter.

Doc. no. 44-18 (June 16, 2015 Letter) (ellipsis supplied).

Auto-Owners sent Roop another letter the following day, June 17, 2015, informing him that "Auto-Owners is undertaking defense of this action under a reservation of rights," and that Decatur attorney David Langston of the Harris, Daddell & Shanks firm had been assigned to represent him in the underlying state-court action.[54] The letter, which was sent by certified mail, was signed for on June 18, 2015, by Carmen Roop.[55]

Auto-Owners sent Roop a supplemental reservation of rights letter on

---

[53] There is no explanation in the record why this letter states the policy was in effective until May 4, 2014, when the policy documents themselves clearly reflect that the policy was cancelled on March 9, 2014, for non-payment of premiums.

[54] Doc. no. 44-19 (June 17, 2015 Letter).

[55] *Id.* at ECF 6; *see also* doc. no. 44-17 (Affidavit of Todd Simpson), at ¶ 8.

September 11, 2015, *via* both regular and certified mail.[56]  That letter was returned to Auto-Owners on October 22, 2015, marked "unclaimed."[57]  As of August 23, 2016, when Todd Simpson, an Auto-Owners Claims Manager, executed an affidavit in support of Auto-Owners' motion for summary judgment, Roop had not responded to Auto-Owners' reservation of rights letters, provided Auto-Owners with notice of the underlying lawsuit, contacted Auto-Owners, or cooperated in any way with Auto-Owners or the attorney Auto-Owners had hired for him.[58]  There also is no indication that Roop has done any of those things since the date on which Simpson executed his affidavit.  Even so, Auto-Owners has continued to provide defense coverage to Roop in the underlying state court action under a reservation of rights.[59]

## V. DISCUSSION

### A.   Ripeness

The trial in the underlying state court action has been reset several times, and it is currently scheduled to begin on March 27, 2017.  Because no judgment has yet been entered in the underlying action, the Bells assert that any determination by this court of Auto-Owners' duty to indemnify either Wier-Wright or Roop for the claims

---

[56] Doc. no. 44-22 (September 11, 2015 Letter).

[57] Doc. no. 44-23 (Certified Mail Receipt).

[58] Doc. no. 44-17 (Affidavit of Todd Simpson), at ¶¶ 11-14, 16-17.

[59] *Id.* at ¶ 15.

asserted against them by the Bells would be premature.

Article III, Section 2 of the United States Constitution limits the judicial power of federal courts to "cases or controversies":  a limitation that courts have interpreted as including a requirement that suits be "ripe" for adjudication.  Because a suit that lacks ripeness is not justiciable, the absence of ripeness precludes the federal courts from exercising jurisdiction.  *See*, *e.g.*, 16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* 3d § 227:21 (1997).

As such, this court must determine whether Auto-Owners' claims present an "actual controversy" within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.  *See Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272 (1941).  When making that determination,

> the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-242 [(1937)].  It is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case. *Nashville, C. & St. L. Ry. Co. v. Wallace*, [288 U.S. 249,] 261 [(1933)].

*Id.* at 273 (alterations supplied).

Courts have uniformly held that "the duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit." *Nationwide*

-25-

*Insurance v. Zavalis*, 52 F.3d 689, 693 (7th Cir.1995) (citing *Heffernan & Co. v. Hartford Insurance Co.*, 614 A.2d 295, 298 (Pa. Super. 1992); *United Services Automobile Association v. Elitzky*, 517 A.2d 982, 992 (Pa. Super. 1986)). As the Middle District of Alabama recognized in *Guaranty National Insurance Co. v. Beeline Stores, Inc.*, 945 F. Supp. 1510 (M.D. Ala. 1996):

> Although the existence of *a duty to defend* may be established by the allegations in the injured party's complaint, the insurer's liability to [*i.e.,* duty to *indemnify*] the insured is ultimately established by what is developed at trial. *So a determination of the duty to indemnify cannot be made at a preliminary stage in the proceedings, when it is still possible for the plaintiff in the underlying lawsuit to change the theory of liability and assert a claim that is covered by the policy at issue.*

*Id.* at 1514 (citing *Ladner & Co. v. Southern Guaranty National Insurance Co.*, 347 So. 2d 100, 104 (Ala. 1977); *Home Insurance Co. v. Rice*, 585 So. 2d 859, 861 (Ala. 1991); *Tapscott v. Allstate Insurance Co.*, 526 So. 2d 570, 573-75 (Ala. 1988)) (emphasis supplied).

Moreover, if the insured prevailed in the underlying lawsuit, the court would not have to reach the issue of whether the insured was entitled to indemnification, and the "time and effort the court and the parties would have expended in resolving the issue would be wasted." *Auto-Owners Insurance Co. v. Toole*, 947 F. Supp. 1557, 1566 (M.D. Ala. 1996) (citing *Beeline*, 945 F. Supp. at 1514).

Thus, the courts in *Beeline* and *Toole* declined to resolve the issue of indemnity

pending the resolution of the underlying lawsuit on the insured's liability.  *See*
*Beeline*, 945 F. Supp. at 1514-15 (denying without prejudice the insurer's motion for
declaratory judgment); *Toole*, 947 F. Supp. at 1565-66 (same).

This court finds the *Beeline* and *Toole* decisions to be persuasive.  Accordingly,
summary judgment will be not granted at this time with regard to Auto-Owners' duty
to *indemnify* either Wier-Wright or Roop on the claims asserted against them in the
underlying state court action.  The issue of indemnity may be revisited, if necessary,
after judgment has been entered in the underlying case.[60]

That does not mean, however, that this court cannot, or should not, consider
Auto-Owners' duty to provide a defense to Wier-Wright and Roop in the state court
case.  An insurance company's *duty to defend* is based upon

> the potential that the trial of the underlying suit against the insured may
> develop facts showing that the occurrence is within the coverage; the
> duty to pay the judgment or reasonable settlement [*i.e., to indemnify the
> insured*] is based on facts having been established which show the
> occurrence to actually have been within the coverage.

16 *Couch on Insurance* 3d § 227:21 (alteration supplied, footnote omitted).  Thus, an
insurance company's "duty to defend is . . . broader than the duty to pay [*i.e.,*
indemnify], arises well before any duty to pay is conclusively established, and may

---

[60] This court already has extended the parties' deadline for filing final dispositive motions
to May 1, 2017, *after* the conclusion of the state court trial.  *See* doc. no. 63 (text order extending
dispositive motion deadline to May 1, 2007).

well exist in a case in which the insurer is ultimately deemed not to be liable on the policy." *Id.* § 227:27 (1997) (ellipsis and alteration supplied). "Accordingly, [the question of] whether an insurer has *a duty to defend a suit against its insured* is generally considered a controversy ripe for declaratory relief, even when the issue of *the insurer's actual liability in the underlying suit* may not be considered until after a resolution of that suit." *Id.* § 227:29 (alteration and emphasis supplied). *See also Allstate Indemnity Co. v. Lewis*, 985 F. Supp. 1341, 1344-49 (M.D. Ala. 1997) (granting request for judgment on the pleadings); *Toole*, 947 F. Supp. at 1561-65 (granting request for declaratory judgment); *Beeline*, 945 F. Supp. at 1513-14 (granting request for declaratory judgment).

## B.    Auto-Owners' Duty to Defend Wier-Wright

"An insurance company's duty to defend its insured from suit is determined by the language of the insurance policy and by the allegations in the complaint filed against the insured." *Lewis*, 985 F. Supp. at 1344 (citing *ALFA Mutual Insurance Co. v. Morrison*, 613 So. 2d 381, 382 (Ala. 1993); *Ladner*, 347 So. 2d at 102). This is because:

> "As long as the complaint comprehends an injury which may be within the scope of the policy, the company must defend the insured until the insurer can confine the claim to a recovery that the policy does not cover." *United Services* [*Automobile Association. v. Elitzky*], 517 A.2d [982,] 985 [(Pa. Super. Ct. 1986)]; *see also Terra Nova Ins. Co. v. 900*

*Bar, Inc.*, 887 F.2d 1213, 1226 (3d Cir. 1989) (applying Pennsylvania law); [*Pacific Indemnity Co. v.*] *Linn*, 766 F.2d [754,] 760 [(3d Cir. 1985)]; *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (1987); [*Aetna Casualty & Surety Co. v.*] *Roe*, 650 A.2d [94,] 99 [(Pa. Super. Ct.1994)]; *Heffernan & Co.* [*v. Hartford Insurance Co.*], 614 A.2d [295,] 297-98 [(Pa. Super. Ct. 1992)].  Any doubts on this score are to be resolved in favor of the insured.  *Antrim Mining, Inc. v. Pennsylvania Insurance Guaranty Ass'n*, 648 A.2d 532, 535 (Pa. Super. 1994) (quoting *O'Brien Energy Systems Inc. v. American Employers' Insurance Co.*, 629 A.2d 957, 960 (Pa. Super. 1993)).  Thus, a court ordinarily will have no reason to immerse itself in the facts surrounding the incident in question; it need only look to the allegations made against the insured and decide whether, if proven, those allegations would establish an injury that the policy would cover.

*Zavalis*, 52 F.3d at 694 (alterations supplied); *see also American Safety Indemnity Co. v. T.H. Taylor, Inc.*, 513 F. App'x 807, 811 (11th Cir. 2013) (citing *Hartford Casualty Insurance Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1009 (Ala. 2005); *United States Fidelity & Guaranty Co. v. Armstrong*, 479 So. 2d 1164, 1167 (Ala. 1985) (explaining that "the general rule is that, in deciding whether a duty to defend exists, the courts look to the issue pleadings alleging the claim being made against the insured").

Auto-Owners asserts that it has no duty to defend Wier-Wright because the abandonment of a construction project does not constitute an "occurrence" under the Wier-Wright policy, and because the damages claimed by the Bells in the underlying state court action did not occur within the Wier-Wright policy period.

-29-

### 1.     Whether there was an "occurrence" under the policy

The Wier-Wright policy only provides coverage for damages caused by an "occurrence," which is defined as "*an accident*, including continuous or repeated exposure to substantially the same general harmful conditions."[61]  The policy does not provide a separate definition for the term "accident."   Even so, in a case involving policy language identical to that at issue here, the Alabama Supreme Court adopted the *Black's Law Dictionary* definition of the term "accident":  *i.e.,* "'An unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could be reasonably anticipated.'"  *Hartford Casualty Insurance Co.*, 928 So. 2d. at 1011 (quoting *Black's Law Dictionary* 15 (7th ed. 1999)).  Stated differently:  "'The term ["accident"] has . . . been variously defined as something unforeseen, unexpected, or unusual.'"  *Hartford Casualty Insurance Co.,* 928 So. 2d at 1011 (alteration and ellipsis in original).

According to Auto-Owners, Wier-Wright's abandonment of the Bells' construction project was not unintended, unforseen, unexpected, or unusual.  The Bells do not appear to dispute that point.[62]  Indeed, a panel of the Eleventh Circuit has

---

[61] Doc. no. 46-3 (Wier-Wright Policy), at ECF 26, Section V(14) (emphasis supplied).

[62] *See* doc. no. 55 (Response to Motion for Summary Judgment), at 12 ("If the Bells' only claims against Wier-Wright arise from its abandonment of the construction of the house, **and** a verdict entered in the underlying case reflecting that fact, then Auto-Owners' Motion might be more meritorious, and its reliance on <u>Snider</u> more justified.") (emphasis in original).

held in a case applying Alabama law and interpreting an insurance policy with language identical to that at issue here that a contractor's "abandonment of the job was a deliberate, purposeful act, not an accident, and damages arising out of this conduct are not covered under the Policy." *Pennsylvania National Mutual Casualty Insurance Co. v. Snider*, 607 F. App'x 879, 883 (11th Cir. 2015) (citing *Shane Traylor Cabinetmaker, L.L.C. v. American Resources Insurance Co.*, 126 So. 3d 163, 170 (Ala. 2013)). Even though the *Snider* decision is unpublished, it is highly persuasive because it is consistent with Alabama law. *See, e.g., Shane Traylor Cabinetmaker*, 126 So. 3d at 170 (holding that there was no "occurrence" when the underlying claim arose from the contractor's abandonment of the job, not from his defective work).

Even so, the Bells argue that their claims against Wier-Wright in the underlying state court action are not limited to Wier-Wright's *abandonment* of the construction project. The Bells also asserted claims based upon the leaking roof and resulting damage to their home and personal property,[63] as well as upon Wier-Wright's failure to construct the home in a workmanlike manner prior to its abandonment of the project.[64] Because the roof was completed *before* Wier-Wright went out of business

---

[63] *See* doc. no. 46-4 (Second Amended Complaint in State Court Case), at ¶ 19.

[64] *Id.* at ¶ 20.

and abandoned the project, the roof damage, resulting property damage, and faulty

workmanship claims are distinct from Wier-Wright's abandonment of the project.

Moreover:

> Under Alabama law, when a contractor performs faulty work, generally his conduct is not considered an accident. *See Owners Ins. Co. v. Jim Carr Homebuilder, LLC*, No. 1120764, 157 So.3d 148, 155 (Ala. 2014). *When the contractor's faulty work creates a condition that in turn damages property, however*, the conduct is considered an accident under Alabama law. *See id.*

*Snider*, 607 F. App'x at 883 (emphasis supplied).  Thus, Wier-Wright's generally

faulty workmanship would not be an "accident" and, therefore, an "occurrence" under

the policy, but the damage to the Bells' home and personal property could be.

### 2.    Whether the "occurrence" occurred during the Wier-Wright policy period

Auto-Owners also argues that, even if there was "bodily injury" or "property

damage" caused by an "occurrence" under the policy, it did not "occur" within the

policy period.   *See* doc. no. 46-3 (Wier-Wright Policy), at ECF 8, Section

I(A)(1)(b)(2) (stating that the policy provides coverage only if "[t]he 'bodily injury'

or 'property damage' occurs during the policy period") (alteration supplied).  The

policy period for the Wier-Wright policy expired at 12:01 a.m. on February 19,

2012.[65]  Therefore, in order for the policy to provide coverage for the damage to the

---

[65] Doc. no. 46-3 (Wier-Wright Policy), at ECF 2.

Bells' home and personal property, that damage had to "occur" on or before February

19, 2012.

> Alabama law is clear that, in determining the timing of an "occurrence" for insurance coverage purposes, the relevant inquiry is when the property damage took place, not when the underlying work was performed. *See U.S. Fidelity & Guar. Co. v. Warwick Development Co.*, 446 So. 2d 1021, 1024 (Ala. 1984) ("A majority of courts have held that in order to have liability under the terms of such a policy the 'occurrence' must arise during the policy period, for it is the insurance that is in force at the time of the property damage that is applicable rather than insurance that was in force when the work was performed.") (citations omitted). Simply put, "as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy ***is not the time the wrongful act was committed but the time the complaining party was actually damaged***." *Warwick*, 446 So. 2d at 1024 (citations omitted and emphasis added). This rule (which is sometimes labeled in the literature as a manifestation theory for triggering coverage) is firmly entrenched in Alabama jurisprudence. *See Alabama Plating Co. v. U.S. Fidelity and Guar. Co.*, 690 So. 2d 331, 334 n. 1 (Ala. 1996) ("Under the rule of . . . *Warwick* . . ., the time of the 'occurrences' under the liability insurance policies at issue is the time the property was actually injured").

*Cincinnati Insurance Co. v. Amerisure Insurance Co.*, No. CIV.A. 11-0271-WS-M,

2012 WL 4033724, *9 (S.D. Ala. Sept. 12, 2012) (emphasis and ellipses in original).

Even though *Cincinnati Insurance Co.* is only an unpublished decision from

another federal district court, this court finds it to be persuasive because it is premised

upon settled Alabama law.  Moreover, the facts of the *Cincinnati Insurance Co.* case

are similar to the facts at issue here.  In that case, the issue was whether there was

coverage under a Commercial General Liability policy issued by Amerisure Insurance Company ("Amerisure") to a contractor called G.R. Harvill, Inc. ("Harvill"), for water damage to the balconies in a condominium complex called Dolphin Key, which had been constructed by Harvill. *Id.* at *1. The policy period was September 1, 2000 to September 1, 2004. Harvill completed construction of the balconies during October of 2000. Some water intrusion was detected around the balconies during the summer of 2003, and Harvill made repairs to address that problem early in 2004. *Id.* Additional water damage was detected during the spring of 2007, and Dolphin Key filed suit in state court against Harvill and Dudley Flotte, an architect who had approved certain design changes to the balcony. *Id.* at *2-*3.

> The complaint in that case could not have been more clear as to time frame, alleging that "[i]n the Spring of 2007, the balconies began to sag." . . . The complaint traced the sagging-balcony problem back to the use of untreated materials as supportive beams for the balconies, and further alleged "that improper waterproofing of the balcony decking and intersections resulted in moisture exposure to these beams and failure thereof." . . . Pursuant to these and similar allegations, Dolphin Key brought claims against Harvill and Flotte for breach of contract, negligence and suppression. Undergirding these claims were Dolphin Key's theories that Harvill had failed to perform its work in a workmanlike manner or in a manner consistent with the job's plans and specifications, and that Harvill had failed to address waterproofing issues in a good and workmanlike manner but instead substituted improper materials, all without notifying Dolphin Key. . . .

*Cincinnati Insurance Co.,* 2012 WL 4033724, at *3 (alteration in original, record

citations omitted).

In the federal declaratory judgment action, the district court noted that the Amerisure policy only provided Harvill with coverage for claims that "occurr[ed] during the policy period." *Id.* at \*8 (alteration supplied). "Applying Alabama's manifestation trigger for liability coverage," the district court concluded that it was "of no consequence when Harvill performed or oversaw the defective work on the property's balconies. Instead, the timing of the 'occurrence' [was] pegged to when Dolphin Key was actually damaged." *Id.* at \*10 (alteration supplied).

The district court concluded that the damage *occurred* when the water leaks first began to manifest during the spring of 2007. Indeed, "Dolphin Key consistently and unequivocally framed its claims as being for damage that was observed beginning in 2007," including references its complaint and in correspondence with Harvill and his attorneys. *Id.* The court rejected Harvill's counter-argument that, because the balcony problems reported in 2003 occurred in the same areas as, and had the same root cause as, the problems later discovered in 2007, the problems must have been "'continuous from 2003 to 2007,' such that the 'occurrence' for which Harvill sought coverage actually began in 2003, well within the Amerisure policy period." *Id.* at \*11. The court reasoned that if the damage had in fact been continuous since 2003, Dolphin Key would have noticed the damage during the intervening years and taken

some sort of remedial or litigious action long before the spring of 2007. *Id.* "Instead,

what the record show[ed was] a discrete occurrence in 2003 that was remediated to

the satisfaction of all in 2004, and then a new discrete occurrence in 2007 that formed

the sole basis of Dolphin Key's claims for which Harvill sought coverage from

Amerisure." *Id.* at *11 (alteration supplied).

Moreover, according to the U.S. District Court for the Southern District of

Alabama,

> Alabama courts have never construed the manifestation trigger so
> broadly as to be satisfied by incremental, imperceptible property
> deterioration that the complaining party cannot see, does not observe,
> and does not even know is happening, especially where the complaining
> party had full use and enjoyment of the property during that period and
> did not bring claims for damages during that period.

*Id.* at *12 (footnote omitted).  Therefore, the fact that the sagging balconies first

detected in 2007 actually were caused by droplets of water that gradually seeped into

the balconies between 2003 and 2007 was irrelevant. *Id.*  For all of those reasons, the

district court found that the claims asserted by Dolphin Key against Harvill in state

court concerned property damage that occurred outside the applicable period of the

Amerisure policy period, and Amerisure was not required to provide coverage for

those claims. *Id.* at *13.

Similarly, in the present case, the damage to the Bells' home and personal

property did not manifest until February of 2013, *after* the Wier-Wright policy expired.  Thus, according to the *Cincinnati Insurance Co.* decision and the Alabama law upon which it is founded, the damage did not "occur" until February of 2013, even though the root cause of the damage allegedly was faulty construction that was completed in 2011, and even though the Bells first noticed the roof leaks in 2011.  The Bells moved into the house in August of 2012, believing that the leaks first identified in 2011 had been resolved, and they did not complain of any further leaks or resulting damage until February of 2013, despite living in the house throughout the intervening months.  Moreover, the Bells' Second Amended Complaint in the state court action does not mention anything about roof leaks occurring during 2011.  Instead, the complaint states:  "On or about February of 2013, the home's roof *began to leak*."[66]  Accordingly, none of the Bells' claims for damage to their home and personal property occurred within the Wier-Wright policy period, and the policy does not provide coverage for those claims.

The Bells also argue that they "suffered emotional distress and mental anguish as a result of Wier-Wight's actions from December of 2011 when the leaks occurred, through January of 2012, when Wiersig announced he could not complete the house,

---

[66] Doc. no. 44-3 (Second Amended Complaint in State Court Case), at ECF 6, ¶ 19 (emphasis supplied).

through (and past) February of 2012, when the Wier-Wright policy lapsed."[67]  There is some dispute in the evidence regarding whether the Bells actually *did* suffer any emotional distress or mental anguish as a result of the leaks that occurred during 2011, before the policy expired.[68]  Even assuming that they did, however, they did not state any such claims in their state court complaint.

Because the Bells' Second Amended Complaint in the state court case does not contain any claims that are both covered by the Wier-Wright policy, and occurred within the policy period, Auto-Owners does not have a duty to defend Wier-Wright for the claims asserted by the Bells.  *See Zavalis*, 52 F.3d at 694  (stating that a court should "look to the allegations made against the insured and decide whether, if proven, those allegations would establish an injury that the policy would cover").  Accordingly, Auto-Owners' motion for summary judgment is due to be granted with regard to Auto-Owners' *duty to defend* Wier-Wright against the claims asserted in the

---

[67] Doc. no. 55 (Response to Motion for Summary Judgment), at 18.  Mental anguish could be considered "bodily injury," which is covered under the policy if it is caused by an "occurrence." Bodily injury includes "bodily sickness or bodily disease."  Doc. no. 46-3 (Wier-Wright policy), at ECF 24, Section, V(4).

[68] *Compare* doc. no. 55-1 (Affidavit of Justin Kane Bell), at ¶ 7 ("These continuing roof leaks in 2011 caused my wife and I emotional distress . . . ."), *with* doc. no. 46-6 (Deposition of Amy Bell), at 128 (stating that the Bells felt "pretty good" about the construction project until Wier-Wright abandoned it in January of 2012, and that they were "excited" about the house).

Only mental anguish caused by roof leaks and resulting property damage may be considered. The Bells may also have suffered mental anguish as a result of Wier-Wright's abandonment of the project, but as discussed on pages 30-32, *supra*, there is no coverage available for damages related to the abandonment of the project.

underlying state court action.

## C.     Auto-Owners' Duty to Defend Jason Roop

Auto-Owners argues that it has no duty to defend Roop against either the claims asserted by the Bells, or the cross-claims asserted by Wier-Wright, because all the damage to the Bells' home occurred prior the effective date of the Jason Roop policy, because Roop failed to comply with the notice conditions in his policy, and because Roop has failed to cooperate in the defense of the state court case.

### 1.     Whether the damages occurred during the Jason Roop policy period

Like the Wier-Wright policy, the Jason Roop policy only provides coverage for "bodily injury" or "property damage" that "occurs during the policy period."[69]  The policy was only in effect from January 3, 2014, to March 9, 2014, so only damages occurring during the two months and six days elapsing between those dates could be covered.[70]  Because the Bells first noticed damage to the interior of their home in February of 2013, almost a year *before* the Roop policy went into effect, Auto-Owners is correct in stating that "damages to the Bells' house *began* long before Auto-Owners first issued a CGL policy to Roop in January 2014."[71]

---

[69] Doc. no. 44-2 (Jason Roop Policy), at ECF 10, ¶ I(A)(1)(b)(2).

[70] The policy originally was issued for a period covering January 3, 2014 to January 3, 2015, but it was cancelled due to non-payment effective March 9, 2014.  *See id.* at ECF 2, 6.

[71] Doc. no. 44-1 (Auto-Owners Insurance Company's Statement of Undisputed Material Facts and Brief in Support of Motion for Summary Judgment on the Issue of Defense and Indemnity Coverage for Jason Roop), at ECF 17 (emphasis supplied).

But, that is not the end of the inquiry.  Justin Kane Bell testified that the roof continued to leak every time it rained until September of 2014, including during the months of January, February, and March of 2014, causing not only damage to their home, furnishings, and appliances, but also emotional distress for him and his wife.[72] Thus, while the damages may have *begun* prior to the policy period, the Bells allege that they continued throughout that entire period.  The Jason Roop policy could provide coverage for any property damage and emotional distress the Bells suffered during the two months and six days elapsing between January 3 and March 9, 2014. Auto-Owners' motion for summary judgment on the duty to defend Roop will be granted on these grounds with regard to any damages occurring *outside* the period beginning on January 3, 2014 and ending on March 9 of that same year, but it will be denied with regard to any damages occurring within that time frame.

## 2.    Roop's compliance with notice conditions

Auto-Owners also asserts that Roop is not entitled to any coverage because he failed to comply with the notice provisions in his policy.  The Jason Roop policy requires Roop to "see to it that [Auto-Owners is] notified as soon as practicable of an 'occurrence or an offense which may result in a claim," or of a "claim" or "suit."[73]

---

[72] Doc. no. 55-1 (Affidavit of Justin Kane Bell), at ¶¶ 9-10.

[73] Doc. no. 44-2 (Jason Roop policy), at ECF 23, Section IV(2)(a)-(b) (alteration supplied).

It also requires Roop to "[i]mmediately send [Auto-Owners] copies of any correspondence, demands, notices, summonses or papers in connection with any claim or 'suit.'"[74]   According to Auto-Owners, Roop never satisfied these requirements because he never *personally* notified Auto-Owners of the claims asserted by the Bells in state court.

Auto-Owners relies upon the Alabama Supreme Court's decision in *Reeves v. State Farm Fire and Casualty Co.,* 539 So. 2d 252 (Ala. 1989).  There, the policy stated the following with regard to an insured's obligation to provide the insurance company with notice of claims:

> "3. Duties after Loss. In case of an accident or occurrence, the insured shall perform the following duties that apply. You should cooperate with us in seeing that these duties are performed:
>
> > "a. give written notice to us or our agent as soon as practicable, which sets forth:
> >
> > > "(1) the identity of this policy insured;
> > >
> > > "(2) reasonably available information on the time, place and circumstances of the accident or occurrence; and
> > >
> > > "(3) names and addresses of any claimants and available witnesses:
> >
> > "b. forward to us every notice, demand, summons, or other process relating to the accident or occurrence;

---

[74] *Id.* at ECF 23, Section IV(2)(c)(1) (alterations supplied).

". . . .

"6. Suit Against Us. No action shall be brought against us unless there
has been compliance with the policy provisions."

*Reeves*, 539 So. 2d at 254 (ellipsis in original).  The insureds did not provide notice

of a claim to their State Farm insurance agent until five years and nine months after

the incident leading to the claim occurred.  *Id.*  Even so, the agent had actual notice

of the incident because he had read about it in the newspaper, clipped the newspaper

article, and placed it in his file.  *Id.*  The Alabama Supreme Court held that the agent's

actual notice of the incident was irrelevant, since the insureds waited such an

unreasonably long time to provide direct notice:

> The fact that the insured's agent in this case learned of the shooting
> incident through the newspaper does not satisfy the requirement that
> written notice of the occurrence be given to the insurance company or
> its agents.  In *Continental Ins. Co. v. Parkes*, 142 Ala. 650, 39 So. 204
> (1905), a case involving an action on a fire policy requiring "immediate
> notice of any loss thereby in writing to the company," the Court held
> that this condition was not satisfied by the fact that the insurer had
> actual notice of the loss within 48 hours from sources independent of the
> insured.  Likewise, other courts have more recently concluded that the
> insured must comply with the notice provisions and cannot rely on
> information the insurer or its agents may have received from newspapers
> or other sources. *City of Harrisburg v. International Surplus Lines Ins.
> Co.*, 596 F. Supp. 954 (M.D. Pa. 1984); *Insurance Co. of North America
> v. Waldroup*, 462 F. Supp. 161 (M.D. Ga.1978).
>
> The [insureds] also suggest that State Farm had actual notice of
> the occurrence in question because of an alleged "policy" of State Farm
> that required its agent to notify the Company of any occurrences known

-42-

to the agent that might give rise to a claim from one of its insureds. This argument is also without merit. First, the claims superintendent for State Farm stated in an affidavit submitted by State Farm with its motion for summary judgment that no such policy existed within the Company. But, even assuming that such a policy existed, there is no evidence of any lack of compliance with it. [The agent] testified that the newspaper articles did not indicate to him the existence of any "occurrence" within the meaning of the policy or any claim that could be made under the policy. Furthermore, any policy State Farm may have had in this regard would not obviate the requirement that the insured give written notice of the occurrence, its time, place, and circumstances, along with the names and addresses of any claimants or available witnesses.

*Reeves*, 539 So. 2d at 254-55 (alterations supplied)

Here, Auto-Owners did not learn of the Bells' claims against Roop in state court from a newspaper article or other external, unrelated source. Instead, Wier-Wright's attorney sent Roop's insurance agent a letter and notice of loss form on May 28, 2015, informing the agent of the Bells' claims against Roop and asking him to "notify all insurance carriers that have insured Mr. Roop and his various entities. . . ."[75] Roop's insurance agent forwarded that letter to Auto-Owners on June 1, 2015.[76] Auto-Owners cannot deny receiving the letter, because it promptly engaged an attorney to represent Roop under a reservation of rights. That attorney first filed pleadings on Roop's behalf in the state court case on June 18 and 19, 2015, three months after Roop was served with copies of the Bells' Second Amended Complaint

---

[75] Doc. no. 44-16 (May 28, 2015 letter).

[76] *Id.*

-43-

and Wier-Wright's First Amended Cross-Claim Complaint in the state court case. Auto-Owners also received notice of those filings because it had intervened in the state court case. Thus, even if the May 28 letter from Wier-Wright's attorney were not sufficient to place Auto-Owners on notice, *after* it was forwarded to Auto-Owners by Roop's agent, the June 18 and 19 pleadings would have been. Auto-Owners has cited no authority, and this court has located none, to indicate that *the insured's attorney* cannot provide sufficient notice of a pending claim, especially when that attorney was hired by the insurance company itself.

This result is consistent with the language of the Roop policy, which requires Roop to "*see to it that* [*Auto-Owners is*] *notified* as soon as practicable" of a potential claim. The policy does not state that notice must come from Roop himself, instead of from a duly authorized agent.

This result also is consistent with the policy underlying the inclusion of notice provisions in insurance policies. As the Alabama Supreme Court has explained:

> The purposes behind these two types of notice is well settled: An insurer must have timely notice of an event or occurrence in order to form an intelligent estimate of its rights and liabilities under the policy, to afford it an opportunity to investigate, to allow it to participate in the litigation, and to prevent fraud. *Pan American Fire & Cas. Co. v. DeKalb-Cherokee Counties Gas Dist.*, 289 Ala. 206, 266 So. 2d 763 (1972). The purpose of a notice-of-lawsuit provision in an insurance policy is to give the insurer the opportunity to control litigation on which its contractual liability hinges. *North River Ins. Co. v. Overton*,

59 So. 3d 1 (Ala. 2010).

*Travelers Indemnity Co. of Connecticut v. Miller*, 86 So. 3d 338, 347 (Ala. 2011). *See also, e.g., Nationwide Property & Casualty Insurance Co. v. Bliss,* No. 1:11-CV-03075-RBP, 2013 WL 2444013, at *6 (N.D. Ala. May 30, 2013).   Here, Auto-Owners has had ample opportunity to control the underlying state court litigation, because it selected an attorney to represent Roop.  That attorney answered the claims against Roop within three months of when Roop was served with the pleadings asserting those claims, and he has been representing Roop in the state court case ever since.[77]

Auto-Owners' motion for summary judgment will be denied on the contention that Auto-Owners had no duty to defend Roop due to Roop's failure to comply with the notice provisions of the policy.

### 3.   Roop's failure to cooperate in the defense of the case

Finally, Auto-Owners argues that there is no coverage under the Roop policy because Roop has failed to cooperate with Auto-Owners in the defense of the

---

[77] Auto-Owners does not separately argue that the approximate three-month delay between Roop's receipt of service of the state court pleadings and Auto-Owners' receipt of notice of the claims via Roop's filing of responsive pleadings was too lengthy.  Indeed, while the Alabama Supreme Court has held that "[a] five-month delay in giving notice is sufficiently protracted as to require the insured to offer evidence of a reasonable excuse for the delay," *Nationwide Mutual Fire Insurance Co. v. Estate of Files*, 10 So. 3d 533, 536 (Ala. 2008) (alteration supplied, citations omitted), the court could locate no authority stating that a three-month delay was too lengthy.

underlying state court case.  The Roop policy requires the insured to "[c]ooperate

with [Auto-Owners] in the investigation or settlement of any claim or defense of any

'suit' . . . ."[78]

> As the insurer, Auto-Owners has "the burden of proof to establish
> noncooperation." *Colorado Cas. Ins. Co. v. The Kirby Co.*, 2008 WL
> 149996, at *4 (M.D. Ala. Jan. 14, 2008) (internal citations and quotation
> marks omitted); *see also Ex parte Clarke*, 728 So. 2d 135, 141 (Ala.
> 1998) ("[T]he burden of proof to establish non-cooperation rest[s] upon
> the insurer.") (quoting *Employers Ins. Co. v. Crook*, 160 So. 2d 463, 465
> (Ala. 1964)).  "In order for [Premiere's] noncooperation to constitute a
> breach of insurance coverage, the lack of cooperation must be 'both
> material and substantial.'" *Colorado Cas. Ins. Co.*, 2008 WL 149996, at
> *4 (quoting *Clarke*, 728 So.2d at 141).  "'The test for determining what
> is material and substantial . . . amounts to a requirement of prejudice to
> the insurer.'" *Alberson v. Nationwide Assurance Co.*, 2003 WL
> 23335453, at *3 (M.D. Ala. Oct. 24, 2003) (quoting *Williams v.
> Alabama Farm Bureau Mut. Cas. Ins. Co.*, 416 So. 2d 744, 746 (Ala.
> 1982)); *see also Home Indem. Co. v. Reed Equip., Co.*, 381 So. 2d 45,
> 49 (Ala. 1980) (holding that under Alabama law an insured's
> noncooperation must be "material and substantial — resulting in
> prejudice to the insurer").  "What constitutes a failure of cooperation by
> the insured is usually a question of fact. . . ." *Alberson*, 2003 WL
> 23335453, at *3 (internal quotation marks and citations omitted).  But
> "non-cooperation is deemed prejudicial if the failure to cooperate
> negate[s] the only evidence the insurer could offer in defense . . . or the
> insurer is deprived of the opportunity to conduct an investigation and
> mount a defense." *Colorado Cas. Ins. Co.*, 2008 WL 149996, at *4
> (internal quotation marks and citations omitted).

*Auto-Owners Insurance Co. v. Premiere Restoration & Remodeling, Inc.*, No.

2:13-CV-01530-MHH, 2014 WL 7369391, at *6 (N.D. Ala. Dec. 29, 2014) (third

---

[78] Doc. no. 44-2 (Jason Roop policy), at ECF 23, Section IV(2)(c)(3) (alterations supplied).

alteration supplied, other alterations and ellipses in original).

It is undisputed that Roop has failed to cooperate with Auto-Owners, or to participate in any way, in the state court litigation.  But Auto-Owners has not been prejudiced as a result of Roop's non-cooperation.  Roop has been represented by an attorney in the state court case, and there is no indication that the attorney has been either actually or effectively deprived of the ability to mount a defense because of Roop's non-cooperation.  Auto-Owners speculates that Roop also will fail to participate in the trial of the case, and that it will thereby be prejudiced because "co-defendants will assuredly lay blame at the feet of the absent defendant."[79]  Such speculation is insufficient for a showing of *actual* prejudice.  As the Bells point out, "[n]o default judgment was entered against Roop [in the state court case], no sanctions have been issued against Roop for failure to provide discovery, nor has Auto-Owners submitted any evidence that witnesses, documents, exhibits, or other evidence relating to the claims against Roop have become available."[80]  If any of those failures actually do manifest during the trial of the state court case, and any actual prejudice does result, Auto-Owners might be able to avoid coverage [*i.e.,* the *duty to indemnify*] as a result of Roop's non-cooperation.  As things currently stand,

---

[79] Doc. no. 44-1 (Auto-Owners Insurance Company's Statement of Undisputed Material Facts and Brief in Support of Motion for Summary Judgment on the Issue of Defense and Indemnity Coverage for Jason Roop), at ECF 25.

[80] Doc. no. 52 (Response to Motion for Summary Judgment), at 13 (alterations supplied).

however, Roop's non-cooperation will not relieve Auto-Owners of its *duty to defend* Roop in the state court case.

### 4.     Summary

In summary, Auto-Owners' motion for summary judgment with regard to the duty to defend Jason Roop is due to be granted in part and denied in part.  There is no coverage under the Roop policy for any damages that occurred outside the policy period beginning on January 3, 2014, and ending two months and six days thereafter, on March 9, 2014.  Accordingly, Auto-Owners is not required to defend Roop against any such claims.  It is, however, required to provide a defense to Roop for any claims based upon damages that did occur between January 3 and March 9, 2014.

## VI. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that Auto-Owners' motion for summary judgment regarding defendant Wier-Wright Enterprises, Inc., is GRANTED in part and DENIED IN part.  It is ORDERED, ADJUDGED, and DECLARED that Auto-Owners has no duty to defend Wier-Wright Enterprises, Inc., against any claims asserted against it in *Justin Kane Bell and Amy Bell vs. Wier-Wright Enterprises, Inc. d/b/a Doug Wiersig Homes; Bulldog Construction, LLC; Timothy Widner d/b/a Timothy Widner Construction; Alabama Fireplace and Construction Specialists, LLC; Jason Roop d/b/a Roop Roofing,* Case No. CV 2013-

-48-

902000 JPS in the Circuit Court of Madison County, Alabama.  The motion for summary judgment is DENIED with regard to Auto-Owners' duty to indemnify Wier-Wright, but that denial is without prejudice to Auto-Owners' right to refile the motion, if necessary, after judgment is entered in the state court case.

It is further ORDERED that plaintiff's motion for summary judgment regarding defendant Jason Roop is GRANTED in part and denied in part.  It is ORDERED, ADJUDGED, and DECLARED that Auto-Owners is required to *defend* Jason Roop from any claims for damages that occurred between January 3, 2014 and March 9, 2014, and that are asserted against him in *Justin Kane Bell and Amy Bell vs. Wier-Wright Enterprises, Inc. d/b/a Doug Wiersig Homes; Bulldog Construction, LLC; Timothy Widner d/b/a Timothy Widner Construction; Alabama Fireplace and Construction Specialists, LLC; Jason Roop d/b/a Roop Roofing,* Case No. CV 2013-902000 JPS in the Circuit Court of Madison County, Alabama.  It is further ORDERED, ADJUDGED, and DECLARED that Auto-Owners is is not required to *defend* Jason Roop from any claims for damages that did not occur between January 3, 2014 and March 9, 2014.  The motion for summary judgment is DENIED with regard to Auto-Owners' duty to indemnify Jason Roop, but that denial is without prejudice to Auto-Owners' right to refile the motion, if necessary, after judgment is entered in the state court case.

DONE this 15th day of March, 2017.

_____
United States District Judge